# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | |
|---|---|
| SOUTHWEST CHEESE COMPANY, LLC, a Delaware Company;<br><br>    Plaintiff,<br><br>v.<br><br>CHERNEY MICROBIOLOGICAL SERVICES, LTD., a Wisconsin Corporation;<br><br>    Defendants. | Civil No. _____<br><br>Judge _____ |

## COMPLAINT

Plaintiff Southwest Cheese Company, LLC ("Southwest" or the "Company"), by and through its counsel of record Holland & Hart LLP, hereby asserts its claims against Defendant, Cherney Microbiological Services, Ltd. ("Cherney") as follows.

## PARTIES

1. Southwest is a Delaware limited liability company with its principal place of business located at 1141 Curry County Road #4, Clovis, New Mexico 88101. The citizenship of its members (and to the extent its members are also limited liability companies) are Delaware, Kansas and New Mexico.

2. Upon information and belief, Defendant Cherney is incorporated in Wisconsin with its principal place of business at 1110 S Huron Road, Green Bay, Wisconsin 54311-8024.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332(a)(1) by virtue of diversity of citizenship.

4. The amount in controversy in this case exceeds $75,000, exclusive of interest and costs.

5. Venue in this district is otherwise proper pursuant to 28 U.S.C. § 1391.

6. Further, the contract between the Parties referred to in this Complaint provides that personal jurisdiction and venue for any dispute arising out of or relating to the agreements thereto are exclusively in this Judicial District.

## GENERAL ALLEGATIONS

### Southwest's Business

7. Southwest was formed in 2003 as a joint venture between dairy processors and farmer cooperatives.

8. Southwest produces block cheese, whey protein, and nutritional ingredients for markets worldwide, primarily serving food processing companies.

9. Southwest employs over 300 individuals, primarily in its state-of-the-art cheese and whey manufacturing facilities in New Mexico. At these facilities, Southwest processes over 3.8 billion pounds of milk, produces in excess of 388 million pounds of block cheese and 29.1 million pounds of high value-added whey proteins powders each year, which it sells in national and international markets.

## Regulation of Cheese and Dairy Production

10. The safety of cheese products in the United States is governed by the Federal Food Drug, and Cosmetic Act (FDCA) and administered by the Food and Drug Administration (FDA). *See* 21 U.S.C.A. § 321. The New Mexico Environmental Improvement Board similarly promulgates standards for food protection. *See* N.M. Admin. Code 7.6.2.

11. Under Federal and equivalent State law, cheese may not be introduced or delivered into interstate commerce if "adulterated." *See* 21 U.S.C.A. § 331; N.M. Admin. Code 7.6.2.11.

12. Under 21 U.S.C.A. § 342 (a)(1), a food is "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." *See also* N.M. Stat. Ann. § 25-2-10. FDA regulations connote that adulteration includes something added to the product as a "result of environmental, agricultural, industrial, or other contamination." 21 C.F.R. § 109.3.

13. In addition, if a food "has been prepared, packed, or held under insanitary conditions whereby . . . it may have been rendered injurious to health," it is deemed to be "adulterated." 21 U.S.C.A. § 342 (a)(1).

14. Listeria monocytogenes (commonly known as Listeria), an environmental bacterium, is a dangerous food contaminant. In susceptible individuals, it can cause a disease called listeriosis, which may affect the brain, spinal-cord membranes and/or the bloodstream. The Centers for Disease Control and Prevention has estimated that there are annually approximately 1,600 cases of foodborne listeriosis with 1,500 hospitalizations and 260 deaths in the United States. Although the incidence of listeriosis is rare, the mortality rate is high and

particularly high in vulnerable sections of the population, such as pregnant women, newborn babies, the elderly and the immuno-compromised.

15. Since the early 1980's, Listeria has been implicated in several major foodborne outbreaks in North America related to dairy and cheese. In 1981, coleslaw was implicated in a Canadian outbreak resulting in 41 cases and 11 deaths. In 1983, pasteurized milk was the probable vehicle for an outbreak in Massachusetts, with 49 confirmed cases and 14 deaths. A third major outbreak associated with a Mexican-style soft cheese occurred in 1985 in California, with 142 cases and 48 deaths.

16. FDA has established a "zero tolerance" policy for Listeria. Companies who allow Listeria adulterated cheese to enter the market can expect severe penalties, including seizure, injunctions and criminal prosecution.

17. In one recent case, a cheese company involved in Listeria contamination was permanently enjoined from involvement in the industry. See United States v. Vulto Creamery et al., 3:18-CV-331 (N.D.N.Y., March 30, 2018). In another, the individual owner of a cheese company was sentenced to fifteen months in prison after being found responsible for a cheese Listeria outbreak. See United States v. Rivas et al., 1:16-CR-20581 (S.D. Fla., Feb. 6, 2017).

18. Southwest operates according to current good manufacturing practices and strict operating procedures in order to prevent Listeria contamination.

**Listeria Testing**

19. As part of the strict regulatory environment surrounding contaminants such as Listeria, Southwest regularly sends product samples to third party laboratories for biological testing.

20. The typical method of lab testing involves taking a sample, culturing it directly onto a media and incubating it for a period of time, performing presumptive and confirmation tests and comparing it with control cultures (*e.g.*, ISO 11290-1:2017).

21. Defendant Cherney operates several specialty dairy testing laboratories throughout the United States.

22. Cherney represents that it has thirty years of experience as a food safety testing provider within the dairy, and specifically cheese, industry.

23. Cherney represents that its facilities are accredited through the American Association for Laboratory Accreditation (A2LA), specifically with accreditation as to the competency of its testing laboratories (ISO 17025:2005) and conformity of its proficiency testing (ISO 17043:2010).

24. Cherney also represents that it is accredited in the detection and/or enumeration of pathogenic microorganisms such as Listeria species.

## Lab Testing Agreement Between Southwest and Cherney

25. For several years Cherney performed microbiological testing and other services for Southwest primarily at Cherney's main laboratory in Green Bay, Wisconsin.

26. In 2013, Cherney opened a laboratory near Clovis, New Mexico in order to be closer to the dairy industry in New Mexico and West Texas.

27. Because a dedicated laboratory proximate to its processing plant would be a benefit to Southwest, it entered into a Testing Services Agreement (the "Agreement") with Cherney in or around December 2013. A copy of the Agreement is attached hereto as **Exhibit 1**.

28. The Agreement provides that Southwest would utilize Cherney exclusively for certain types of laboratory testing of its products for a period of three (3) years. Ex. 1 at 1.

29. The testing that Cherney agreed to perform under the Agreement included testing for Listeria. Ex. 1 at 7.

30. The Agreement provided that each individual test service would be performed under a purchase order or its equivalent. Ex. 1 at 1.

31. After the expiry of the three (3) year term of the Agreement, and until February 2019, Southwest continued to utilize Cherney for lab services, including microbiological testing of its products, under the same terms and conditions of the Agreement. Cherney continued to accept Southwest's samples for testing and continued to provide the same services as contemplated under the Agreement.

**Southwest Lot 19985 Sample**

32. On or around July 20, 2018, Southwest sent a composite cheese sample from its production lot No. 19985 to Cherney for microbiological testing – specifically for Listeria and Salmonella (the '985 Sample).

33. The '985 Sample was transmitted under Purchase Order No. 4700012199. Cherney acknowledged receipt of the '985 Sample on July 20, 2018 – a copy of its Analysis Request Form for the '985 Sample is attached hereto as **Exhibit 2**.

34. The '985 Sample was a composite sample from batches of cheddar cheese, in size approximately 700,000 pounds, that Southwest had produced on July 18, 2018, and which was immediately ready to market after microbiological testing.

35. On July 22, 2018, Cherney notified Southwest that the '985 Sample tested presumptively for Listeria using the VIDAS test protocol. A copy of the Preliminary Report and email notice is attached as **Exhibit 3**.

36. The following day, Cherney stated to Southwest that it was sending the sample to its Green Bay, Wisconsin lab for confirmation testing and bacterial identification. A copy of Cherney's email and the confirmation testing report received by Southwest is attached as **Exhibit 4**.

37. On July 26, 2018, Southwest sent for testing to Cherney, further samples from every batch of final cheese produced on the same date and from which the '985 Sample was taken – dozens of samples in all – and each one returned negative for Listeria. A copy of the batch sample analysis report is attached as **Exhibit 5**.

38. On July 27, 2018, pursuant to its food safety protocols, Southwest collected a series of environmental monitoring swabs from the areas where the '985 Sample was produced, stored and transported, including manufacturing, laboratory, refrigeration, and transfer areas. Southwest sent the swabs to a third-party laboratory at Mérieux NutriSciences Certification LLC ("Mérieux) for testing – all swabs returned negative for Listeria. A copy of the Mérieux swab analysis report is attached as **Exhibit 6**.

39. Additionally, on July 27, 2018, also pursuant to its food safety protocols, Southwest performed a comprehensive root cause inspection of its plant and production area to detect any points where contamination could have occurred. This inspection did not identify any observable failure points.

40. On July 27, 2018, Southwest requested information from Cherney about the positive control for its Listeria testing. It was informed by Cherney that Cherney had used an American Type Culture Collection sample ("ATCC #19114-17") (the "Control Isolate"). A copy of the emails between Southwest and Cherney with respect to the Control Isolate are attached as **Exhibit 7**.

41. On July 31, 2018, Cherney sent to Southwest an internal investigation memo regarding its positive Listeria result. A copy of this report is attached as **Exhibit 8**. Apparent from this report are a number of errors by Cherney in handling the '985 Sample, including the mis-labelling of the tubes used for testing. Ex. 8 at 1. The report also notes that the tube with the Control Isolate was placed immediately adjacent to the tube with the '985 Sample in the VIDAS testing machine. Ex. 8 at 2.

42. Despite this, in its investigative report Cherney opined that its handling did not cause the positive test result. Ex. 8 at 1 – 2. It stated further that it was unlikely that its process controls contaminated the '985 Sample. Ex. 8 at 2.

43. Cherney's investigative report confirmed that the positive control used was the ATCC #19114-17 sample. Ex. 8 at 8.

44. Southwest requested that Cherney retest the '985 Sample. On August 1, 2018, Cherney sent to Southwest results of the '985 Sample re-test. A copy of the Certificate of Analysis of this testing is attached as **Exhibit 9**. The retest came back negative for Listeria.

45. On August 1, 2018, Southwest sent a split quantity that it had retained of the '985 Sample to Mérieux for confirmation testing. Mérieux performed Listeria testing. A copy of

Mérieux's Listeria confirmation testing report is attached as **Exhibit 10**. The testing of the retained split sample came back negative for Listeria.

46. On October 10, 2018, Cherney returned to Southwest part of the '985 Sample that it had subjected to testing (the "Cherney Sample"). A copy of the emails between Southwest and Cherney with respect to the Cherney Sample are attached as **Exhibit 11**.

47. In October 2018, Southwest sent the Cherney Sample to Mérieux for independent testing. Mérieux also obtained a sample of the Control Isolate #19114-17 that Southwest purchased from American Type Culture Collection (ATCC). Mérieux performed a whole genome sequencing analysis on the Cherney Sample and the Control Isolate. A copy of Mérieux's report is attached as **Exhibit 12**.

48. Mérieux reported that the Listeria bacterium in both the Control Isolate and the Cherney Sample were genetically identical. Ex. 12 at 2.

49. In sum, Cherney's initial positive indication for Listeria on the '985 Sample could not be replicated -- not by Cherney's own retesting of the '985 Sample, nor by Merieux's split-testing. Neither was Listeria indicated on any of the batches from which the '985 Sample was obtained, nor in any of the areas it was stored and transported.

50. What testing did reveal, however, was that the sample that Cherney had represented was the '985 Sample was genetically identical to the Control Isolate, something that could only occur if the '985 Sample was mishandled by Cherney or if Cherney otherwise fundamentally misconstrued its own the test results.

51. Cherney's representation that it had found Listeria in Southwest's '985 Sample was in error.

9

Case 1:19-cv-00706   Filed 05/13/19   Page 9 of 15   Document 1

52. The Southwest '985 Sample was not in fact contaminated with Listeria.

**Harm Caused by the Defendant's Wrongful Acts**

53. After receiving Cherney's initial lab result on July 27, 2018, Southwest put a hold on all cheese from the '985 batches, in total more than 700,000 pounds of product.

54. Because of the hold, the short window to sell the product as premium grade expired. Further, the product required a qualitative downgrade, as any purchaser would be required to perform heat treatment on the cheese prior to putting it to market.

55. While prior to testing, Southwest had a willing buyer for the '985 batches, due to the delay and downgrade, this buyer declined to complete the sale.

56. By early 2019, Southwest had managed to sell the '985 batches in various tranches to alternate buyers, although, some of the product had to be entirely scrapped.

57. On each of these subsequent sales, Southwest was forced to sell at a significant discount, close to one-half of the price it would otherwise have been able to achieve.

58. As a result, Southwest lost approximately $500,000.00 on the proposed sale.

59. In addition, Southwest suffered losses of approximately an additional $50,000.00 on account of testing and retesting costs, the costs of storage, and the value of scrapped product.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

60. Southwest restates, re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

61. Cherney entered into a contract with Southwest to provide it with expert testing services, including but not limited to, testing for Listeria.

62. The terms of the Parties' contract include both express terms and those that may be implied-in-fact based on the Parties' course of conduct.

63. The express terms governing the Parties' contract include those contained in the Agreement (see Ex. 1).

64. In the Agreement Cherney agreed to perform testing in a professional workmanlike manner, in accordance with the highest industry standards and in compliance with all relevant laws and regulations. Ex. 1 at 2.

65. Southwest complied with its obligations under the Agreement. It exclusively used Cherney for the testing contemplated by the Agreement, foregoing the opportunity to use other qualified laboratories, and paid all amounts owing under the Agreement in consideration and in exchange for the bargained-for benefit of professional testing of its products.

66. Instead of delivering reliable and accurate testing information to Southwest, Cherney breached its contract with Southwest by mishandling samples and misconstruing test results, breaches of the most basic industry standards that apply to testing laboratories. Cherney further breached its contract by providing a report to Southwest that incorrectly stated that Southwest's '985 Sample was contaminated with Listeria.

67. As a direct and proximate result of Cherney's contract breach, Southwest has suffered significant damages as described above, including diminished product value, waste and other monetary damages and out-of-pocket expenses.

## SECOND CLAIM FOR RELIEF
### (Breach of Express Warranty)

68. Southwest restates, re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

69. Cherney agreed to test Southwest's '985 Sample for microbiological contamination.

70. By and through the Agreement, Cherney expressly warranted that it was qualified to perform the testing, agreed to perform testing in a professional workman like manner, in accordance with the highest industry standards and in compliance with all relevant laws and regulations. Ex. 1 at 2.

71. Southwest reasonably relied on Cherney's expertise to test its cheese that it intended to market.

72. Cherney failed to perform its testing services in accordance with professional and industry standards. Allowing the '985 Sample to be mishandled and misconstruing test results was contrary to Cherney's express warranty, constituting a breach of its fundamental warranties.

73. Cherney's breach of its express warranty caused direct and proximate damages to Southwest including diminished product value, waste and other monetary damages and out-of-pocket expenses.

74. Southwest notified Cherney of Cherney's breach of warranty within a reasonable time, and Cherney has done nothing to rectify it.

### THIRD CLAIM FOR RELIEF
### (Breach of Implied Warranty for a Particular Purpose)

75. Southwest restates, re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

76. Cherney agreed to test Southwest's '985 Sample for microbiological contamination.

77. Southwest reasonably relied on Cherney's expertise to test its cheese that it intended to market and impliedly warranted to Southwest that it would do so in accordance with professional and industry standards.

78. Cherney failed to perform its testing services in accordance with relevant standards when it allowed the '985 Sample to be mishandled and when it misconstrued test results as described above.

79. Cherney's breach of its implied warranty caused damages to Southwest, including diminished product value, waste and other monetary damages and out-of-pocket expenses.

80. Southwest notified Cherney of Cherney's breach of warranty within a reasonable time, and Cherney has done nothing to rectify it.

**FOURTH CLAIM FOR RELIEF**
**(Negligence – Professional Negligence – Negligent Misrepresentation)**

81. Southwest restates, re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

82. Cherney holds itself out as a professional, accredited and competent testing laboratory.

83. Cherney owed Southwest a duty to ensure that its laboratory services were performed competently and to professional standards.

84. Cherney also owed Southwest a duty to ensure its representations and statements regarding its testing were accurate and not false or misleading.

85. Cherney breached its duty to Southwest by carelessly and negligently permitting its samples to be mishandled, misconstruing test results, misrepresenting an erroneous positive and failing to investigate or discover its error.

86. Cherney's negligence proximately caused Southwest to suffer diminished product value, waste and other monetary damages and out-of-pocket expenses.

87. Southwest notified Cherney of Cherney's negligence, and Cherney has done nothing to rectify it.

**SIXTH CLAIM FOR RELIEF**
**(Attorney Fees)**

88. Southwest restates, re-alleges and incorporates the foregoing paragraphs as if fully set forth herein.

89. The Agreement (as defined above) provides in relevant part that the prevailing party in any dispute between the Parties will be entitled to recover its reasonable attorney fees and costs.

90. Under Wisconsin law fees attorney fees may be awarded based on clear, specific contractual agreement.

91. To the extent that it is the prevailing party in this litigation, Southwest is entitled to attorney fees and costs in an amount to be determined at trial or upon motion.

**JURY DEMAND**

Plaintiff Southwest demands that all claims and causes of action raised in this Complaint against Defendant Cherney be tried to a jury to the fullest extent possible under the United States and Wisconsin Constitutions.

**PRAYER FOR RELIEF**

WHEREFORE, Southwest prays for the following relief:

1. That the Court enter judgment against Defendant Cherney in the amount of damages suffered by Southwest to be proven at trial.

2. That the Court enter an order for such other equitable relief as may be appropriate.

3. That the Court award Southwest Pre-Judgment and Post-Judgment interest on its damages.

4. That the Court award Southwest its reasonable attorneys' fees and costs.

5. For such other and further relief as the Court deems appropriate.

DATED this 13th day of May, 2019.

HOLLAND & HART LLP

/s/ *Brent E. Johnson*
Brent E. Johnson (UT 7558)
Nathan Archibald (UT 14855)
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Tel: (801) 799-5800
Fax: (801) 799-5700
bjohnson@hollandhart.com
narchibald@hollandhart.com

*Attorneys for Plaintiff Southwest Cheese Company, LLC*

12444203_2